Richardson, J.,
delivered the opinion of the court.
The question to be decided is, whether the Railroad Company have, by their charter, or by the Acts of 1828 and 1832, the legal right to use locomotive steam engines, in transporting their cars from Line to Mary streets?
The principles of law and policy involved, are not novel; but their application to such a case, makes up much interest in the issue. Railroads have just commenced, but are already in vigorous growth — and the question naturally arises, how shall they be treated in law? According to law, is the answer.
*137 By their charter of 1827, the company is authorized to construct a railroad “ from the city of Charleston to Savannah river,” &c. By the Act of 1828, the company are authorized to farm out any part of their right of conveyance, and to prescribe the locomotive to be used — and by the Act of 1832, p. 52, the following enactment is made: “ Be it further enacted, that the said company be and they are hereby authorized and empowered to construct a single track of their road and the necessary number of turn out tracks, from the present termination of their road at Line street, on Charleston neck, to the Boundary line of the city of' Charleston, through any public streets, roads or squares, on the said track; Provided, that no locomotive steam engine be used below Line street; and provided also, that the railroad be so constructed as not to impede the ordinary passage of carriages and -persons along the said roads, streets or squares.”
These are all the specific enactments that belong to the case, and we look in vain for any express authority to use locomotive engines on any part of the road. But the Act of 1832, authorizes an extension of the road from its termination at Line street, down to Boundary street, prohibiting in the same sentence the use of steam engines on this part of the road. This seems to be a specific exception to an admitted power, plainly indicating that the company have authority to use such engines on other parts of the road. It is no more than an indication ; but it enforces the reasonable supposition, that such a power was implied, by the original authority to construct a railroad, and which power had been already, in 1832, carried into practical operation. Throughout the former road to Line street, steam engines were used from the beginning. I think that it may be justly inferred, that the company bad general authority to use steam engines as their propelling power. This obvious intention of an Act, plainly implied by its context and concurring with its object, is part of the act in terms ; that power is as much embraced as horse power ; yet steam power is not absolutely essential to railroads; other power may be used; and we would hesitate to say that the Legislature could not regulate or even prohibit the use of a peculiar locomotive power, which it had never expressly granted by the company’s charter, and which was not absolutely essential to the general authority to construct a railroad, *138 although it is a most convenient power. But it is not necessary to decide such a question. The Act af 1832,. assumes that the termination of the road was at Line street; and in point of fact the company had there terminated the road, and never before 1884 constructed the extension of the road to Mary street, and then used the motive power by means of horses, up to 1835, at which time they substituted steam for horse power, and the indictment followed. Now, after such assumption by the Legislature, that the road terminated at Line street, such practical admission by the company, that it did there terminate: and after so plain an acceptance of the further right, under the Act of 1832, to extend the road below Line street, without the use of steam power, it would be hazardous to conclude that the company had the absolute right under their original charter, to extend the road from Line to Boundary streets, and to use locomotive steam power on that part, in defiance of the prohibition of the Act of 1832.
Admit for a moment that they originally had the absolute right to the steam engine, yet it is plain they must have • accepted the limitation as well as the privileges conferred by the Act of 1832 ; and one of these limitations is, the prohibition to use steam power below Line street. This limitation, then, to the use of the steam engine, would seem to follow as by consent, and the acceptance of the Act of 1832.
This view entirely counteracts the argument drawn from the letter of the Act of 1827, to construct a railroad from the outer verge of the city of Charleston to Hamburg, with the implied privilege of using the steam power at every step, as inseparable from the right of using the road itself.
But now take another view. Admit that the company has, as incident to the railroad, the right to use any motive power whatever; and that this road might be brought to Boundary street, under the original charter; yet is it not plain that such incidental power must be used, as any man must use his most unalienable rights and privileges? That is, in such away as not to infringe another person’s rights, and also, so as to create no public nuisance. It is in this, that the company claim exemption; but nine nuisances out of ten arise from the abuse or misuse of some undoubted right or privilege. The useful and now indispensable tallow-chandlery and soap- *139 boiling, become nuisances when placed in a populous town ; no one can question the right to erect such a manufactory, yet in a particular position it would become a nuisance. The notion, then, that the incidental right of using steam power, would justify its use to impel the cars of a railroad through a town already settled like Charleston Neck, would rather present a question of nuisance or not, to be decided by a jury, not by the Judge. But no such question is made in the present case. The jury have decided on the facts, and we must find in the defence a legal justification of the nuisance so verified by the verdict, or the verdict must stand.
The principle last noticed is very general. This corrective power of the law, makes despotic powers (and they are not a few in any society,) inure to their proper end: and, its various application is a distinguishing feature in modern law, modern policy, and modern government. Even verdicts might, and would become nuisances, in some cases, but for the corrective power, which may say even to the country— “ Error has crept in, ,go then, and again consider your decision, and respect the laws of the land.” And such is the authority of their own laws, and such the power of reason, that the very hands that caused, obey the mandate and remove all complaint in a second verdict. Civilization would advance its tranquil tide with tardy gradations, indeed, without the principle, that the right of using, should not be carried in practice to the abuse of our privileges. I might well stop here, but it may be satisfactory in a case of new impression, to notice leading adjudiciations made elsewhere, upon the same subject. Judges are under great obligations to be governed by uniform principles of law, and we are not to suffer the exigency of a particular case, to creep in, and infract such principles, however hard the consequences upon individuals, or important the interest at stake.
In not one of these adjudications is there a doubt suggested, that locomotive steam engines, when used on railroads, may be the means of nuisances in certain locations. In the case of the King against Morris, Barn. & Ald. 431, the defendant was held liable by all the Judges, and the general principles fully sustained.
Let us consider for a moment the leading ease adduced *140 in the defence. The King against Plase and others, Barn. & Ald. 31. The justification set up in that case was— 1st. That the defendants by the express provision of their charter had a right to use steam for power. 2d. That by the charter the railroad was to run in a specific line, which line was near the high-road ; in reference to which the steam engine had become a nuisance, and it followed, from these premises, that the charter had lifted the charge of nuisance, not in general, but in reference to this particular high road on which the passengers were incommoded by the steam engine. In such a case, it is easy to feel, that both the road and the railway, being highway and equally the creations of express law, the high road may as well give way as the railroad; and the injury to the former line of communication was compensated by the increased benefit of the other; and accordingly the Court decided, that the interference with the convenience of passengers on this road, must have been contemplated, and therefore sanctioned by the legislature, when they gave to the defendants the unqualified use of the steam engine.
This case is well decided upon the particular premises. But reverse the premises, and is not the converse of the decision equally correct? Suppose for a moment, that the defendants in that case had no express right to use the steam engine; or 2d. that they had not the express right to run the railroad near a particular road; is it not explicitly plain, that then they must have been found guilty of the nuisance? And is not this the very case now before the Court ? 1st. Our railroad company have not the express right to use the steam engine; 2d. even if they had such a right, there is little reason, merely from the sweeping words, “to construct a railroad, on the most practicable routes,* from Charleston to Hamburg,” one hundred and thirty miles, to say that the legislature had in contemplation the possible nuisance to an intervening town and had sanctioned such a nuisance. But laying aside the little reason for so sweeping an intendment of the charter, the legislature tells us by the Act of 1832, that the company shall have no right to use the steam engine “below Line street.” The reason is plain — it was then a settled town; and coupled with that fact, much reasoning might be drawn from this express subsequent prohibi *141 tion, tbat snob, would be the intendment of the original charter, if the road had run to any settled town whatever.
This observation introduces the argument urged for the company; that inasmuch as they are bound to compensate individuals for losses caused by the steam engine, when done to a house erected before the charter, there is no call for making them liable for public nuisance also; the practice of readily compensating individuals for such losses, is creditable to the company, but the very rule of law, under which they admit their liability in such cases, does well illustrate why they are liable for a nuisance. The fact, that they are liable for mischief done to individuals in solitary places, proves that the same exhibition of the means of mischief, (the steam engines) when presented in populous settlements inflict well grounded terror, and the public would have, then, their remedy to forestall the mischief. This is done by indictment for a nuisance. The same argument might be urged in favor of A. who assaults B.; B. would have his action for the individual injury, but the State would also have its prosecution, for the breach of the peace. And the same may be said of all misdemeanors, where an injury is inflicted on an individual, by the same act. The duty of prosecution and the and the policy of prevention, require a public prosecution.
I have now, through respect-for the great numbers concerned for, or against the prosecution, considered the whole series of argument; not one of which has engendered doubt in the mind of the Court; and I will conclude, with a single reflection. Railroad associations have become of great and growing importance; they afford high-ways of incalculable value to commerce, and the ever ready means of social intercourse between distant communities. They are, at this moment, welding together, link after link, the conservative chain, which is to hold in firm union, more that six and twenty States ; but for such noble ends, we must ingraft the railroad system in the affections, as well as the interests of the people; and the parents of so much enterprize, wealth, and national good, must not be justified when wrong, else they might become the tyrants of the day.
The motion is dismissed.